**CITY OF HOUSTON, Appellant,**

v.

**Edward W. HRUSKA, Appellee.**

No. 3174.

Court of Civil Appeals of Texas.

Waco.

Oct. 28, 1954.

Rehearing Denied Nov. 24, 1954.

**779**

Will G. Sears, City Atty., Richard H. Burks, Asst. City Atty., Robert L. Burns, Asst. City Atty., Houston, for appellant.

Paul Strong, Russell Scott and Pat N. Fahey, Houston, for appellee.

TIREY, Justice.

This action is grounded on the common law relating to master and servant. Appellee, an employee of the City of Houston, brought this suit for damages because of injuries sustained by him while working in the street repair division of the Department of Public Works of the City of Houston. The City of Houston presented its motion for an instructed verdict at the close of plaintiff's evidence and presented a second motion for instructed verdict at the close of all the evidence, both motions being overruled.

The jury in its verdict found substantially that the written report for appellee dated April 19, 1948, signed by Starkey and Windecker, was brought to the attention of the head the Public Works Department of the City of Houston and to the attention of the Civil Service Department within a few days after its date; that the City of Houston failed to act on the written report for appellee and that within thirty days after April 17, 1948, the City had full knowledge of the circumstances surrounding the occurrence in question at Oates and Solo Streets and the injuries sustained by the plaintiff on that occasion; and that the City of Houston, having such knowledge, by its course of conduct during the ninety days succeeding April 17, 1948 misled appellee and lulled him into a sense of security; and further found that such feeling of security was the cause of appellee's failure to file his claim for damages because of his injuries within the ninety day period and that a person of ordinary prudence, situated as was appellee, would have concluded that the City had determined not to assert its right and enforce the charter provision requiring the filing of claims within ninety days from their occurrence; that Windecker was in charge of employees of the City, including appellee, who were present at the time of the occurrence; that the method used in taking the culvert section out of the ditch was dangerous; that such danger was not readily apparent to an ordinarily prudent person of mature years inexperienced and uninstructed in such method of removing such a culvert section under the same or similar circumstances, and that Windecker, on the occasion in question, knew that such method was dangerous, and that appellee was inexperienced and did not know and appreciate the dangers involved in the method used in taking the culvert section out of the ditch, and that Windecker permitted appellee to do the work which he was doing when he was injured without giving him sufficient warning of the situation to enable him to understand and appreciate its dangers and to have avoided them in the exercise of ordinary care, and that such failure to give appellee such warning was negligence, and that such negligence was a proximate cause of the injuries to appellee; that appellee did not voluntarily assist Mack Aranda in the work of placing the board under the concrete pipe, and that

appellee's act in not placing himself at the end of the board but instead placing himself forward from the end and under the board was not negligence; that the injury was not the result of an unavoidable accident. The jury awarded appellee the following sums: For physical pain sustained from April 17, 1948, down to the day of this trial, $5,000; for mental anguish sustained by appellee from April 17, 1948 to date of trial, $5,000; for loss of earnings sustained from April 17, 1948 to date of trial, $7,400; that the present cash value of such physical pain that appellee will in reasonable probability suffer in the future, beyond the date of trial, $2,500; that the present cash value of the mental anguish appellee will in reasonable probability suffer beyond the date of trial directly resulting from the injuries, $2,500; the present cash value of the loss of earnings appellee will in reasonable probability suffer in the future beyond date of trial $18,000; that the reasonable expense of hospital attention, medicine furnished to appellee to care for his injuries sustained on April 17, 1948, from that date to date of trial, $2,000.

The court overruled the City's motion for judgment non obstante veredicto and granted appellee's motion for judgment and the City of Houston seasonably perfected its appeal to the Galveston Court and the cause is here on transfer order of our Supreme Court.

There is a recital in the decree to the effect that appellant was entitled to have deducted the sum of $10,984.51 from the total sum awarded by the jury ($42,400.-00); leaving a balance of $31,415.49 awarded to appellee in the decree. Appellee is not complaining of the deductions made.

Appellant's Point 1 is substantially that the court erred in overruling its motion for instructed verdict because there is no evidence that appellee gave written notice of his claim to the City within ninety days after his alleged injuries, as required by mandatory provisions of Art. 9, Sec. 11 of its charter, and that the evidence shows as a matter of law that the unauthorized

act of Hord, an employee of the City, in unlawfully retaining appellee on his payroll while he was not working and other acts relied upon by appellee did not estop the City from requiring compliance with the charter provisions.

Appellee's first counter point is:

"The trial court's holding and jury finding that Houston was estopped to assert failure to comply with the 90 day claim provision of its Charter were amply sustained by evidence showing; that Houston Ordinance No. 8700 authorized payment up to four months for injuries without reference to responsibility and the Council had never refused a request for further extension; that although Hruska did no work after his injury, nevertheless Houston kept him on the payroll and paid him his usual salary twice monthly for almost a year, and although his foreman and his supervisor made a written report 'for Eddie Hruska' of the incident and injury within 2 days afterwards, which was promptly brought to the attention of the director of the Public Works Department and was forwarded to the Civil Service Department; that the City received at the City Hall, from his doctor, during the 90 days succeeding his injury, 5 detailed reports showing his condition; that almost all of the numerous payrolls had the word 'injured' opposite his name, and were approved and signed by the Director of Public Works, the Director of Civil Service, the City Treasurer, the City Comptroller, and another signature 'for the Mayor'; that until his pay was stopped, almost a year after the injury, no suggestion was made by anyone that Houston was not going to take care of him, nor was any request made of him for additional information of any kind; that, if Houston hadn't kept him on the payroll, Hruska would have filed his claim earlier, and did go to see an attorney and filed claim when Houston cut off his pay; and Houston's ordinance au-

thorizing only the City Council to 'waive' charter provision has no application to 'estoppel'; the Houston Council has no authority by its own legislative fiat to deprive the courts of power to determine if the facts gave rise to estoppel, nor to make estoppel dependent on Houston Council permission; the irregular exercise of express authority to pay under Ordinance No. 8700 created an estoppel."

Evidence was tendered to the effect that appellee was injured while working with a crew of men removing sections of a concrete storm sewer; each section was 36 inches in diameter, approximately four feet long, and was in an east-west ditch approximately four feet deep. The sections were connected and it was necessary that each section be disjoined from the adjacent section in order that a chain could be placed entirely through the section being removed. The method used was as follows: A tree stump about six inches thick and five feet long was placed in the open end of the culvert section, the end of a chain tied around it and the other end of the chain secured to a maintainer on the south side of the ditch. The maintainer would "back up" to raise the pipe a short distance and a man holding a plank variously estimated from 2 x 8 to 2 x 12, about 8 to 9 feet long, would place the plank alongside of the pipe and slightly underneath it, and the pipe was then lowered down on it. This operation disconnected the culvert section from the adjoining section; a chain could then be placed through the first section, secured to the maintainer and the section pulled out; that approximately three sections had been removed before the appellee was injured while assisting a fellow workman, Aranda, the man holding the plank; that the accident happened in this manner: As the maintainer "backed up", raising the culvert section, appellee and Aranda placed the plank between the culvert section and the side of the ditch and slightly underneath the culvert; appellee was standing close to the ditch with his arms around the plank and holding the plank with both hands so that his head was near the plank; just back of him, assisting in the holding was Aranda; the operator of the maintainer backed it too far and the tree stump slipped out of the culvert section and the culvert section fell striking the plank and causing the plank to break and a portion of it to strike appellee on the right side of his head in the region of his ear.

In appellant's brief we find substantially the following statements: The Department of Public Works was created by Ordinance 8342, enacted on May 10, 1943. Such Department was placed under the direction and supervision of the City Manager and was divided into nine divisions, one of which was the Street Division. The Street Division was assigned the duty of making all necessary street repairs and cleaning and cutting weeds on streets. The Ordinance established the position of Director as the head of the Department, to be appointed by the City Manager or Mayor, and be under the direction and supervision of the City Manager or Mayor. The general duties of the Director were prescribed.

Section 17 of the Ordinance provided that the Street Division would be under the immediate supervision of the General Superintendent of the Street Division. Similar division heads were created for each of the other divisions of the Department. The Ordinance further provided that the duties and functions of all subordinate employees of the Department should be as set forth and prescribed in the Rules, Regulations and Classifications of the Civil Service Commission.

Neither appellee nor anyone in his behalf gave the Mayor and City Council notice in writing of his injury within 90 days from the date of his injury as required by Article IX, Section 11, Charter of the City of Houston, but on April 1, 1949 (nearly one year after the date of appellee's injury), appellee filed a written notice of claim with the Mayor and City Council.

Art. IX, Sec. 11 provides:

"Notice of claim against city for damages. Before the City of Houston

shall be liable for damages for personal injuries of any kind, or for injuries to or destruction of property of any kind, the person injured, or the owner of the property injured or destroyed or someone in his behalf, shall give the Mayor and City Council notice in writing of such injury or destruction, duly verified, within 90 days after the same has been sustained, stating in such written notice, when, where and how the injury or destruction occurred, and the apparent extent thereof, the amount of damage sustained, the amount for which claimant will settle, the actual residence of the claimant by street and number at the date the claim is presented, and the actual residence of such claimant for six months immediately preceding the occurrence of such injuries or destruction, and the names and addresses of the witnesses upon whom he relies to establish his claim, and a failure to so notify the Mayor and City Council within the time and manner specified herein shall exonerate, excuse and exempt the city from any liability whatsoever, provided that nothing herein shall be construed to effect or repeal section 12 of Article IX of this charter."

Appellant specially pleaded that Ordinance No. 845, enacted September 16, 1946, prohibited such officers and employees from waiving the requirement that appellee file his notice of claim with the Mayor and City Council on or before July 16, 1948.

Ordinance No. 845 provides:

"Section 1: Neither the Mayor, the City Manager, nor any other officer or employee of the City of Houston shall have authority to waive any of the provisions of said Section 11, Article IX, of the Charter of said City, but same may be waived only by a resolution of the City Council of the City of Houston made and passed before the expiration of the said period of ninety days provided for in said

section of the Charter and which resolution shall be evidenced by the minutes and records of said City Council."

There are no allegations or proof that the City Council authorized any officer or employee to waive any of the provisions of said Sec. 11, Art. IX, or adopted any resolution prior to July 16, 1948 (90th day after injury), waiving such provisions. To the contrary, the City Secretary of the City of Houston (custodian of all papers, and records of Council proceedings of the City of Houston and all official records pertaining to the business and matters of the Mayor and City Council, including Ordinance Books, all ordinances, motions and resolutions acted upon and passed by the City Council as well as the minutes thereof) certified that she had examined all of the records and files in her office and that with the exception of the file attached to the certificate and marked Exhibit "A" (the notice of claim filed on April 1, 1949, and related papers), there was no motion, resolution, ordinance, minutes or records of any kind of any action or proceeding by the City Council relative to Edward W. Hruska.

Section 3 of Art. VII, of the Charter of the City, provides in part: "The City Council shall act only by ordinance, resolution or motion, * * *."

Appellee alleged in part in his Fourth Amended Original Petition the following:

"Within two days after the occurrence in question, when plaintiff Hruska was injured as aforesaid, the said foreman Martin Windecker, and plaintiff Hruska's regular immediate superior in his employment with the defendant, City of Houston, W. H. Starkey made and submitted to the City a written detailed report of the occurrence in question 'for Edward W. Hruska, Division No. 3', the original of which bearing said date is among the files of and in the possession of the Director of Civil Service of defendant City."

Appellee tendered in evidence Exhibit No. 4 as follows:

"Mr. J. M. Nagle: Martin Windecker—making an accident report for Eddie Hruska—Division No. 3, April 19, 1948.

"I am making this accident report for Eddie Hruska, truck driver for the Street Repair Division, out of Division No. 3. About 2 P.M., Saturday afternoon he was taking out pipe from a ditch with a machine and we had a stick in the pipe to lift it up until we could put a chain through it to lift it out of the ditch. When we had it up a little ways we put a board under it, and in some way the pipe slipped back breaking the board and the end of the board hit Mr. Hruska behind the left ear. An ambulance was called and he was taken to the Jefferson Davis Hospital where they examined him and told him he was not hurt. I, W. H. Starkey, Foreman of Division No. 3, went and got him and they told me there was nothing the matter with him. Then, during the night (Saturday) Mr. Hruska complained of feeling worse, so his brother said they called the St. Joseph Hospital to send a doctor as his brother was bleeding from his ear. He was taken to the St. Joseph Hospital and is still there."

Martin Windecker testified that he and Mr. Starkey made the report and took it to Mr. Nagle's office and Mr. Hord testified that Windecker made the report direct to Mr. Nagle. Mr. Hord further testified that the report passed through him to Mr. Nagle; that nothing further was done to investigate the injury or accident; that this was just a routine accident report; that whenever there was an accident, the foreman was supposed to make a report; that a report would be made even if a car received a dented fender; and that the notice was in the usual form.

J. M. Nagle testified that ordinary routine required the Division Foreman to report an accident or injury within a few days after its occurrence; that he did not recall having seen the report.

Roy Floyd, Director of Civil Service, testified that reports of accidents were received in the Civil Service office; that the Windecker report was received and placed in the personnel file.

Appellee further pleaded:

"On or about April 30, 1948, the defendant City received a written report from Dr. Keith Bradford concerning plaintiff's injuries, and describing them, such report being dated April 29, 1948, and being addressed to Mr. Harry Hord, at the City Hall, City of Houston, Texas. Additional letters were sent by Dr. Bradford to Mr. Hord at the City Hall, written under dates May 10, 1948, May 29, 1948, June 21st and July 15, 1948, all giving the details of and reports on the injuries sustained by plaintiff. On or about July 22, 1948, at the instance of Mr. Harry Hord, Superintendent of the Street & Bridge Department of the defendant City, plaintiff Hruska was sent for examination of his injuries to the regular city doctors, the Feagan Clinic, where he was examined, and written report of such examination was sent to Mr. Hord under date June (July) 22, 1948, by Dr. E. J. Tucker, and again on July 30, 1948, by Dr. W. M. Wallis. The defendant City also received a complete medical report in writing, dated June (July) 22, 1948, from Dr. E. J. Tucker, one of the city's doctors at the Feagin Clinic. Each and all of the above referred to letters and reports mentioned in this paragraph is on file with the Civil Service Department of the City of Houston, which is hereby notified to produce the same upon the trial hereof."

Appellee introduced as his Exhibits Nos. 5, 6, 7, 8 and 9, five letters purporting to be from Dr. F. Keith Bradford, appellee's physician, to Mr. H. C. Hord. These letters were dated April 28th, May 10th, May 29th, June 21st and July 15th, all in 1948.

In general, these letters described appellee's physical condition. The letter dated July 15th recommended that appellee return to work to "a moderately light job." These exhibits were admitted in evidence for the limited purposes of showing "notice to the City of the physical condition of Mr. Hruska during the time which he was supposed to have filed his claim, and the names of the doctors who were treating him."

For the same limited purposes, appellee introduced as Exhibit No. 12 a letter dated July 30, 1948, purporting to be from Dr. W. M. Wallis to H. C. Hord, and his Exhibit No. 13, a letter dated July 22, 1948, addressed to "Mr. Hord" and purporting to be from Dr. E. J. Tucker. Each of the last two mentioned letters also referred to appellee's physical condition.

A close inspection of the stamp marks on each of these letters reveals that the letters were received in the Civil Service office on March 17, 1949. The Director of Civil Service, Roy Floyd, testified that the letters came from his records.

Hord testified that he thought he told appellee to go see the Public Works doctor at the Feagin Clinic.

There was no evidence that appellee had any knowledge of these letters or their contents.

Appellant specially alleged that Ordinance 845 prohibited any officer from estopping the City Council from requiring appellee to comply with the Notice of Claim provision, and that by virtue of specific Civil Service Rules in Ordinance 8700 the City was prevented by law from paying a salary to any employee absent from work except as provided by such rules.

It further alleged that appellee was unlawfully paid; that he knew that he was not entitled to the pay he was receiving; that the Mayor, Council and Director of Public Works had no knowledge that appellee was carried on the payroll beyond the time authorized by Ordinance 8700; that appellee did not make any application for sick leave, and none was granted, in accordance with Ordinance 8700.

Appellee performed no work for the City after April 17, 1948, the date of his injury, but he was paid his regular pay on April 25 (covering the pay period from April 1st to April 15th) and on the 10th and 25th of each month thereafter until March 25, 1949.

Under Sec. 2, Rule XIV, Civil Service Rules, at the time of his injury, appellee had accrued 14 days sick leave and 7 days vacation time, and was entitled to pay on the following paydays: April 25th, May 10th and May 25th. Only three other paydays occurred prior to expiration of the ninety day period: June 10th, June 25th and July 10th. It is true that appellee did not testify that he relied on or was misled by these three particular pay checks, but he did testify in part as follows:

"Q. If the City hadn't kept you on the payroll, after you were hurt, would you have filed notice of your claim earlier? A. I would.

"Q. Now, Mr. Hruska, did you ever go to see Harry Hord, or any other semi-official, straw boss, foreman, or anything, and have them give any notice to the Mayor and City Council about the incident, about your injury, or anything else? A. No, sir. I didn't know I was supposed to.

"Q. Did you ever give to the City Council or Mayor, in any respect, notice concerning your injury or your accident? A. No."

It was undisputed that appellee performed no work for the City of Houston subsequent to his injury and that he made no application for sick leave; the Mayor had not granted appellee any additional sick leave time as authorized in subsection (b) of Sec. 2 of Rule XIV, and that the Committee provided in subsection (g) thereof had not granted appellee an extension of sick leave as authorized in such subsection. Appellee was paid his regular

wages from the time of his injury through the payday on March 25, 1949.

There was no evidence that the City Council, Mayor, Director of the Department of Public Works, Director of Civil Service, or City Controller authorized anyone to keep appellee on the payroll without appellee performing any labor or work. Nor was there any evidence that the City Council, Mayor or any other official (other than Superintendent Hord and his subordinates) had actual knowledge that appellee was being carried on the payroll while he was not working.

Superintendent Hord testified that the keeping of appellee on the payroll was due solely to his kindness and to his mistake; that the City Council did not have any knowledge of the appellee's injury and that he didn't report the injury to the City Council; that he just made a mistake in carrying appellee on the payroll; that he found out he had made a mistake in carrying appellee on the payroll at about the time appellee was removed from the payroll; that he became suspicious that appellee had obtained other employment and went to Mr. Nagle and told him the whole thing; that he did not remember saying anything to Mr. Nagle about keeping appellee on the payroll prior to that time.

J. M. Nagle, Director of the Department of Public Works, testified that he did not know that appellee was being carried on the payroll without working until shortly before March 17, 1949, that the matter of appellee being carried on the payroll when he was not working was never brought to the attention of the City Council and that if anyone in his Department had called it to the Council's attention he would have known about it; that the Council did not learn anything about appellee's situation from the Public Works Department.

Roy E. Floyd, Director of Civil Service, testified that it was something over a year after appellee was injured before he learned that appellee was being carried on the payroll without working; that at no time during the year 1948 was notice ever brought to the Council that appellee was receiving money for work which he did not perform; that the Mayor and City Council did not have any notice that appellee was being carried on the payroll but not working; and that if a person's name appeared on the payroll he would not have any way of knowing whether the man had worked.

Roy Oakes, City Comptroller, testified that his office did not have any knowledge that City funds were being unlawfully paid to a City employee who was not working; that the Mayor and City Council did not approve any of the payroll sheets; that neither he nor his office had any knowledge whatsoever that appellee was being carried on the payroll and being paid but not working; that from the payroll he had no way of determining whether or not a person listed on the payroll had actually worked; and that he had to rely upon the certification of the Department Head and Division Head.

The City had two pay periods per month, from the 1st to the 15th and 15th to 30th. Paydays for these periods were on the 25th and 10th of each month respectively. From the testimony of J. M. Nagle, Roy Floyd, and Roy Oakes, the following information pertaining to the payrolls was admitted in evidence. Each payroll for the Street Division for the period beginning with the pay period with its pay day on May 25, 1948, and ending with the pay period ending March 15, 1949, contained, among other names in the Division, appellee's name. With the exception of the paydays May 25th, September 25th, November 10th, November 25th, December 10th, all in 1948, and March 25, 1949, each payroll had the word "injured" typed in immediately to the right of appellee's name, (May 25th being the only one in 1948 that is pertinent here).

At the bottom of the page for each pay period there were three vertical columns bearing titles from left to right, as follows: (1) Originating Department, (2) Certified Correct and (3) Approved. Each

such vertical column contained two horizontal columns. The first column under "Originating Department" contained the printed word "Correct" and was signed by W. R. Montgomery, Jr.; Senior Accountant in the Department of Public Works. The second column contained the printed word "Approved" and was signed by J. M. Nagle, or by one of his assistants. Under "Certified Correct" the first column contained the signature of Nellie Krause. This column was designated "Withholding Agent." The second column under "Certified Correct" contained the following: "Names and Rates Okay. L.C.", and the signature of Roy E. Floyd by L. Clifton. The third vertical column containing the word "Approved" was signed by M. D. Collier (City Treasurer) in the first horizontal column and by T. D. Mason (Assistant Controller) in the second column. Underneath Mason's name was printed, "City Controller". With few exceptions the column containing the name of M. D. Collier had the printed word "Mayor" underneath it and the word "for" written in above the printed word.

Roy Oakes testified that his Department prepared a work sheet on the last payroll personnel and sent it to each Department payroll clerk. The payroll clerk checked the payroll for change in status of his working personnel and then returned it to the Comptroller's office where four copies of the permanent payrolls were made. Hord testified that his timekeeper presented the work time of each man to him and that he approved the time and sent it to the payroll clerk.

J. M. Nagle, Director of the Department of Public Works, testified that the payrolls were made up in the Street Division headquarters on Gillette Street at Mr. Hord's office; that when the payroll was passed to him for approval that it indicated that the payroll had met with the approval of Superintendent Hord and the people at his barn; that the payrolls pass from his office to the office of Civil Service.

Rule XVIII, Sec. 1, Civil Service Rules, adopted by Ordinance 8700, provides:

"Payroll Procedure

"Sec. 1. Certification: The City Controller and the City Treasurer shall not issue any warrant or order in payment of any salary or compensation to any person for filing or holding a classified position unless either the payroll, warrant, or check for that work bears the certification of the Civil Service Commission that the person or persons named thereon are correctly named and titled, at legal rate of pay, and were appointed or employed in accordance with the provisions of these rules and regulations."

Roy E. Floyd, Director of Civil Service, testified that the approval by his office only signified that the name of the person was correctly spelled; that his classification was proper and that he was being paid the legal rate of pay established by the City Council; that he did not learn that appellee was being carried on the payroll without working until over one year after appellee's injury.

Nagle, Floyd, Oakes and T. D. Mason, Assistant Comptroller, testified that the typed word "injured" along the right side of appellee's name on the payroll had no significance to them.

Appellee was injured on April 17, 1948, and within the 90 day period following his injury we find on the official payroll sheets appellee's name for April 25, May 10, May 25, June 10, June 25, and July 10, and opposite Hruska's name the word "injured", except the payroll on May 25, 1948. The word "injured" appeared opposite Hruska's name on all of the payroll sheets except May 25, September 25, November 10, November 25, and December 10, all in 1948, and March 25, 1949. We also find that Mr. Nagle's signature, as Director of the Department of Public Works, appeared on each of the payroll sheets except for that of June 25, when his assistant signed. Each of these payroll sheets was also signed and approved by the senior accountant of the Department, the Director of Civil Service, the City Comptroller and the

City Treasurer. The payroll sheets for April 25, May 10, May 25, June 10, June 25, July 10 and July 25 also contained the signature of W. B. Collier, for Mayor. Testimony was also tendered to the effect that unless the Mayor's signature was filled in, the Comptroller will not approve the roll and some person designated by the Mayor's office was supposed to make that signature; that the Comptroller's office called the Mayor's office to determine who is going to sign for him; that Collier was on his list as signing payrolls for the Mayor.

Appellant's position succinctly stated is: (1) Since it is without dispute that appellee did not give notice to the City pursuant to the provisions of Art. 9, Sec. 11 of the Charter, and (2) because the act of Superintendent Hord of the Street Department in retaining appellee on the payroll while he was not working was unauthorized, the action of the City in keeping appellee on the payroll and paying him his wages on the paydays accruing within the 90 days from the date appellee received his injuries did not tender an issue as to estoppel, and therefore this judgment should be reversed and rendered.

Much has been written on the questions here presented. We believe that the applicable law may be found in the following cases and authorities therein collated: Cawthorn v. City of Houston, Tex.Com. App., 231 S.W. 701; City of Waco v. Thralls, Tex.Civ.App., 128 S.W.2d 462 (w. o. j.); Id., Tex.Civ.App., 172 S.W.2d 142 (w. o. m.); Phillips v. City of Abilene, Tex.Civ.App., 195 S.W.2d 147 (writ ref.); Thompson v. Gibbs, 150 Tex. 315, 240 S.W. 2d 287; Heinatz v. Allen, 147 Tex. 512, 217 S.W.2d 994; Stone v. City of Dallas, Tex. Civ.App., 244 S.W.2d 937 (er. dis.); City of Waxahachie v. Harvey, Tex.Civ.App., 255 S.W.2d 549 (n. r. e.).

We think that the factual situation here before us is more similar to the factual situation in the second Thralls case than any we have found. However, this court said in the Thralls case: [172 S.W.2d 146] "The fact that it had long been the custom of the City to pay its employees when they were injured on the job would be evidence, we think, that the payment made to Thralls of his wages on July 5th was duly authorized although he had worked only a few days, if at all, within the period for which payment was made. This, together with plaintiff's testimony that such payment lulled him into a sense of security, was sufficient, we believe, to support the jury's finding on the issue of estoppel."

In the Thralls case we were dealing with a thirty days notice provision of the charter and only one payment was made (under custom) to Thralls, and there was absent any ordinance similar to Ordinance 845 of the City of Houston above quoted. Here we have an injured employee receiving his regular wages through the 90 day period immediately following his injuries, although the word "injured" was typed in opposite his name on the payroll for the 90 day period except for one payday during said 90 day period, that being May 25th. During this time no one in the Public Works Department came to see him about his injuries and no one mentioned to him the necessity to apply for sick leave or said anything about it to him and he did not know he was supposed to file an application and he was not given any forms to fill out for sick leave or for claim against the City and it is without dispute that appellee was a man of limited education, having reached the eighth grade. Under the foregoing conditions, did the City of Houston owe appellee any duty? Certainly the City owed him the duty not to do anything that would mislead him. It is certain that if the City of Houston had stopped paying appellee when it paid him all that it owed him after he received his injuries, three paydays would have elapsed before the 90 day period would have ended, and absent appellee's compliance with the provisions of the City Charter he would not have had an enforcible claim. But here appellant continued to pay appellee, and how was appellee to know that the procedure and authority for keeping him on the payroll was in violation of the provisions of Ordinance 8700. This record shows that the keeping of the payroll and the approval

thereof and the issuance of the vouchers and the signing of same were somewhat complicated. It passed through many hands, including those of the highest officials. Since appellee was injured in the performance of his duty as an employee, and since he was receiving his pay check regularly, as he had been doing while engaged in the performance of his duty, what fact or circumstances occurred to give him notice that he was being unlawfully and illegally paid under the provisions of the Charter and ordinances of the City of Houston? The answer is none.

In Kuehne v. Denson, 219 S.W.2d 1006, 1009, the Supreme Court made this statement: " 'The purpose of estoppels is to prevent inconsistency and fraud resulting in injustice.' * * * 'Estoppel is a doctrine for the prevention of injustice. It is for the protection of those who have been misled by that which upon its face was fair, and whose character as represented parties to the deception will not, in the interest of justice, be heard to deny. But one entitled to its protection must have been misled.' "

Although the foregoing statement of the rule is general, we believe that it is applicable here. The City made three payments to appellee after his injury within the ninety day period that were unauthorized. The three payments so made to appellee were fair upon their face and appellee's testimony was to the effect that payment to him of his wages misled him. It is our view that the factual situation as found by the jury brings appellee's claim under the foregoing doctrine.

We recognize that the payment of wages (unauthorized) by the City of Houston to appellee while he was so injured, regardless of the City's liability, is an example in a high degree of the application of humanitarian principles, but if such payments misled and lulled the appellee into a sense of security, causing him to think that the City was waiving its Charter provisions, it tendered an issue of estoppel, which doctrine has become established as a fundamental principle of our jurisprudence.

Another fundamental principle of our jurisprudence is that equity will not permit a wrongdoer to recover to the detriment of an innocent party. 15A Tex. Digest, Equity, ■ and cases there collated. Here we have the appellant seeking to take advantage of the unauthorized conduct of Superintendent Hord that misled appellee to his detriment.

It is our view that the application of the doctrine of estoppel to this cause is in harmony with that statement of our Supreme Court in Equitable Life Assurance Society v. Ellis, 105 Tex. 526, 147 S.W. 1152, 1156, found on page 1156: "The law is not unmindful that the nature of men is such that not always do they stand unyielding and relentless in the assertion of their rights. It will not hesitate to enforce them, even in hard cases and in the face of a harsh consequence, but it never discourages a generous impulse or imposes a restraint upon magnanimous conduct."

We have carefully considered each of the other points contained in appellant's brief and it is our view that none of them presents reversible error and each is overruled.

Accordingly, the judgment of the trial court is affirmed.